**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gary Pearlmutter, | No. CV-19-08344-PCT-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| County of Coconino, et al., | |
| Defendants. | |

Pending before the Court are two motions for summary judgment (Docs. 96; 97) filed by Plaintiff Garry Pearlmutter ("Pearlmutter") and by Defendants[1] Coconino County (the "County"), James Jayne ("Jayne"), Marie Peoples ("Peoples"), and Arthur Babbot ("Babbot"). The motions are fully briefed. For the following reasons, the Court denies Pearlmutter's Motion and grants Defendants' Motion.

**I.    Background**[2]

    **a. The Parking Incident**

Pearlmutter used to work in the Legal Defender's Office in Flagstaff, Arizona. (Doc. 97 at 2). He was, in fact, the Legal Defender, a position he held by appointed from the County's Board of Supervisors ("BOS") since 2005. (Doc. 96-2 at 49). As the Legal Defender, Pearlmutter was allowed to use special parking spots outside the Legal

---

[1] Defendants requested oral argument on their Motion. (Doc. 97 at 1). The Court finds that the issues have been fully briefed and oral argument will not aid the Court's decision. Therefore, the Court will deny the requests for oral argument. *See* Fed. R. Civ. P. 78(b) (court may decide motions without oral hearings); LRCiv 7.2(f) (same).

[2] Unless the Court notes otherwise, the facts of this background are undisputed.

Defender's Office, which were marked with a sign read "for Legal Defender only." (Doc. 105 at 5). His window overlooked these spots. (*Id.*) And at some time around noon on December 4, 2018, Pearlmutter looked out the window and "saw a white Kia vehicle illegally parked in the Legal Defender's Spot." (Doc. 105 at 5).

Surveillance video of the parking lot shows the Kia's driver, Rachel Simukonda ("Simukonda"), arriving with her daughter, Dominique Durbin ("Durbin"). (Docs. 97-16). In the video, Simukonda uses a cane to navigate the patches of snow around the car. (*Id.*) She had come as a client of the County's Victim Witness Services, whose office was housed in the same building as the Legal Defender's Office. (Doc. 97 at 3). No party disputes that "Simukonda is handicapped, and she had circled the block twice trying to find a handicapped parking spot. When she could not do so, she parked in a Legal Defender spot because it was the closest available." (*Id.*)

After noticing the, as Pearlmutter says, "illegally parked" car, he "came out of the office" got in his BMW and intentionally parked behind the Kia so that it "could not get out without making an inquiry at Pearlmutter's Office." (Doc. 105 at 5). He states he did not know to whom the Kia belonged and that it had been a "common practice" among his peers at the Legal Defender's office "to park behind the illegally parked vehicles to bring attention to the parking issues." (*Id.*)

When Simukonda returned, she and her daughter attempted to move their car out from behind Pearlmutter's BMW. (Docs. 97 at 3; 105 at 6). Seeing this, Pearlmutter came out of his office and confronted the women. (Docs. 97 at 4; 105 at 6). The parties dispute how heated this confrontation was, although they agree that at some point Pearlmutter got back in his car and repositioned it. (Docs. 97 at 4; 105 at 6). Defendants say this was to "further prevent Ms. Simukonda from leaving." (Doc. 97 at 4). Pearlmutter says this was to "get photos of the vehicles' original positions . . . ." (Doc. 105 at 6). Durbin claims that Pearlmutter hit her with his car. (Doc. 97 at 4). Pearlmutter claims he did not. (Doc. 105 at 6). At some point, an officer from the Flagstaff Police Department arrived and documented the incident. (Doc. 97-12). Eventually, the video surveillance shows

Pearlmutter moving his car so that Simukonda and Durbin could leave. (Doc. 97-19).

### b. Pearlmutter's Parting

The day after the parking incident, the Victim Witness Services' executive director emailed Peoples, the Deputy County Manager, and told her Simukonda and Durbin intended to file a police report. (Doc. 97-6). The email says it is "not uncommon" for Pearlmutter to "become overly emotional regarding his parking spots . . . ." (*Id.*) Peoples forwarded the email to Jayne, the County Manager, asking if immediate action was required. (*Id.*)

On December 7, 2018, Pearlmutter was placed on administrative leave pending an investigation into the parking incident. (Doc. 97-6). When Peoples met with Pearlmutter to notify him of the decision to place him on leave, she did not think it was the "time or place" to hear his version of events and so did not permit him to explain what happened. (Doc. 105-4 at 47). Jayne ultimately decided that termination was appropriate. (Docs. 97 at 6; 105 at 8).

On December 21, 2018, Peoples and Jayne met with Pearlmutter and presented him with a draft "Notice of Dismissal from Coconino Counter Employment" in the form of a memorandum from Babbot, the BOS chairman. (Doc. 97-21; 105-4 at 58). Babbot stated in his deposition that he had not drafted this notice before Pearlmutter received it and that he did not remember if he had reviewed it. (Doc. 105-2 at 15). The notice states that the termination would be "effective today and will be presented to the Board of Supervisors for affirmation at its next regular meeting." (Doc. 97-21 at 1).

Rather than face termination, Pearlmutter opted to prepare a handwritten letter, addressed to the County, stating as follows:

> I intend to resign effective from my position effective January 4, 2019. I will follow up with a formal letter of resignation. Thank you for the opportunity to serve the County.

(Doc. 97-9). He signed the letter and dated it December 21, 2018. (*Id.*) Defendants call this letter "a letter of resignation . . . ." (Doc. 97 at 7). Pearlmutter, however, calls it an "intent to resign note . . . ." (Doc. 105 at 10). Despite this disagreement, the parties do not

dispute that "everyone" at the December 21 meeting "understood it was Pearlmutter's last day and he would not be performing any more services for the County." (Doc. 105 at 9).

The parties also do not dispute that Pearlmutter never submitted the formal letter of resignation contemplated in the letter. (Docs. 97 at 7; 105 at 10). Despite not having a formal letter, on the morning of January 3, 2019, the agenda of a future BOS meeting was publicly posted. (Doc. 97-23 at 7). The agenda included the proposed action to "[a]ccept the resignation of Gary Pearlmutter as Legal Defender." (*Id.* at 4). The BOS convened on January 8, 2019, and Pearlmutter's "resignation" was unanimously accepted. (Doc. 97-24). On December 31, 2018, the Mohave County Attorney's Office declined to prosecute charges aggravated assault and disorderly conduct against Pearlmutter due to "[i]nsufficient evidentiary basis of criminal conduct and/or no reasonable likelihood of conviction." (Doc. 105-6 at 6).

### c. Pearlmutter's Allegations Against Jayne and Peoples

Pearlmutter claims that any claim that his "forced resignation" was due to the parking incident is pretextual. (Doc. 82 at ¶ 64). Instead, he claims his departure was forced out of retaliation for two incidents. First, he claims to have met with Jayne in 2018 to report his concerns about sexual misconduct between detention officers and juveniles at the County's Juvenile Detention Center. (Doc. 105 at 4). Jayne did not take any action after the meeting, as he states in his deposition, because he did not "have any authority over" the facility. (Doc. 105-2 at 55). Second, Pearlmutter claims that in 2018 he proposed to study the County's programs concerned with involuntary commitments to Peoples. (Doc. 105 at 4). He claims that Peoples dismissed his proposal because it would have interfered with one of her studies. (*Id.*)

### d. Pearlmutter's Claims

The Second Amended Complaint ("SAC") brings four claims. The first, against the County, alleges a violation of the Arizona Employment Protection Act ("AEPA"), A.R.S. § 23-1501(3)(c)(ii). (Doc. 82 at ¶ 60). He alleges that his employment was terminated "in whole or in part" for reporting illegal activities to Jayne and Peoples, and

that the parking incident was pretextual. (*Id.* at ¶ 63–64). Second, he brings a claim for "Violation of Public Policy" based upon Defendants' retaliation after Pearlmutter reported "potential criminal conduct" and making "proposals" regarding "the need for study of the civil commitment system" in the County. (*Id.* at ¶¶ 68–73). Third, he alleges another AEPA violation and a violation of A.R.S. § 11-581 because of his "termination" by the BOS. (*Id.* at ¶¶ 75–84). And, Fourth, he claims that all Defendants violated his due process rights. (*Id.* at ¶¶ 85–93).

Defendants seek summary judgment on all of these claims. (Doc. 97). Pearlmutter only seeks summary judgment on his third claim, and on the question of whether he adequately mitigated his damages. (Doc. 96).

**II.   Legal Standard**

A court will grant summary judgment if the movant shows there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A factual dispute is genuine when a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Here, a court does not weigh evidence to discern the truth of the matter; it only determines whether there is a genuine issue for trial. *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994). A fact is material when identified as such by substantive law. *Anderson*, 477 U.S. at 248. Only facts that might affect the outcome of a suit under the governing law can preclude an entry of summary judgment. *Id.*

The moving party bears the initial burden of identifying portions of the record, including pleadings, depositions, answers to interrogatories, admissions, and affidavits, that show there is no genuine factual dispute. *Celotex*, 477 U.S. at 323. Once shown, the burden shifts to the non-moving party, which must sufficiently establish the existence of a genuine dispute as to any material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). The evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. But

if the non-movant identifies "evidence [that] is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted).

**III. Discussion**

    **a. Whether Pearlmutter Resigned**

The Court begins with the question of whether it is genuinely disputed that Pearlmutter resigned because all of Pearlmutter's claims are predicated on the allegation that he was terminated, not that he resigned. Having reviewed the evidence cited by the parties, the Court finds there is no genuine dispute of fact. Pearlmutter resigned.

Pearlmutter was presented with a notice of dismissal on December 21, 2018, which awaited affirmation from the BOS. In response to this notice, Pearlmutter wrote a letter stating "I intend to resign effective from my position effective January 4, 2019. I will follow up with a formal letter of resignation." (Doc. 97-9). On January 5, public notice of the BOS' next agenda was posted, and on January 8 the BOS accepted a resignation, despite lacking a follow up from Pearlmutter. (Doc. 97-23 at 4, 7).

Pearlmutter's attempt to recast the December 21 letter as something other than a letter of resignation is unavailing. His general argument is that the December 21 letter is not a letter of resignation, but, rather, "a letter stating **he intended to** resign [to be followed] with a formal letter of resignation." (Doc. 105 at 9). In his deposition, he claims he only intended "to resign after I was going to try to go speak to my attorney . . . about what my options were." (*Id.*) Pearlmutter has not cited to any evidence beyond uncorroborated, self-serving deposition testimony to support his argument that a letter of intent to resign is not a letter of resignation. Such evidence does not establish a genuine factual dispute as to whether he resigned. *See F.T.C. v. Neovi, Inc.*, 604 F.3d 1150, 1159 (9th Cir. 2010).

The letter plainly states an intent to resign on January 4 regardless of whether a "follow up" is submitted. No reasonable jury could read "I intend to resign" and find that Pearlmutter's December 21 letter is anything other than a letter of resignation. Likewise, no reasonable jury could read the letter and find the that the resignation was contingent upon the submission of a formal letter or a discussion with counsel. Therefore, there is no

genuine factual dispute that Pearlmutter resigned.

### b. Whether Pearlmutter's Resignation was Coerced

Pearlmutter also argues that his resignation was "essentially" a "coerced" termination. (Doc. 105 at 12). He cites out-of-circuit caselaw finding that an employee may be constructively discharged when faced with the choice of resignation or termination. (*Id.*) (citing *E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002) ("When an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge."); *Fowler v. Carrollton Pub. Libr.*, 799 F.2d 976, 981 (5th Cir. 1986) (noting that forcing employees to choose between resignation and termination with the intention to avoid "appropriate hearing procedures" may constitute constructive discharge); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987) (finding that notice of an impending termination could be considered a constructive discharge by a trier of fact)).

The Court, however, is bound by Ninth Circuit law and Arizona law, which Pearlmutter fails to cite. In the Ninth Circuit, "an employee may demonstrate that the decision to resign or retire was involuntary under circumstances not involving intolerable or discriminatory working conditions." *Knappenberger v. City of Phoenix*, 566 F.3d 936, 940 (9th Cir. 2009). To demonstrate this, a plaintiff must show that "a reasonable person in [his] position would feel he had no choice but to retire [or resign]." *Kalvinskas v. California Inst. of Tech.*, 96 F.3d 1305, 1308 (9th Cir. 1996). However, a plaintiff cannot claim coercion in "cases in which the employee did have a choice, even if between comparatively unpleasant alternatives." *Knappenberger*, 566 F.3d at 941.

In Arizona, the "fact that an employee is faced with an inherently unpleasant situation or that his or her choice is limited to two unpleasant alternatives—for example, resignation or dismissal—does not necessarily make the employee's decision to resign any less voluntary." *Arizona Dep't of Econ. Sec. v. Redlon*, 156 P.3d 430, 435 (Ariz. Ct. App. 2007). "To determine whether a resignation is voluntary, a court must examine the totality

of the surrounding circumstances to test the ability of the employee to exercise free choice." *Id.*[3]

As Pearlmutter notes in his deposition, he was given the notice of termination or the opportunity to "resign or retire . . . ." (Doc. 97-1 at 8). Though he was presented with *unpleasant* alternatives, such a choice does not show that he was coerced into resigning under both Ninth Circuit and Arizona law. *See Knappenberger*, 566 F.3d at 941; *Redlon*, 156 P.3d 430. Pearlmutter also notes that when he was presented with the notice of dismissal, he asked to speak with an attorney and was told he could not. (Doc. 105 at 9). But lack of counsel does not show that the decision to resign was involuntary because, as Pearlmutter says, he still "had to decide" whether to resign of face termination. (*Id.*) On this record, no reasonable jury could find that Pearlmutter's decision to resign was anything other than voluntary.

### c. Impact of Pearlmutter's Voluntary Resignation on his Claims

Because there is no genuine dispute that Pearlmutter voluntarily resigned, all of his claims fail. His first AEPA claim for retaliation requires that an employer "has terminated the employment relationship . . . ." A.R.S. § 22-1501(3)(c)(ii). His second AEPA claim also requires showing that an "employer has terminated the employment relationship . . . ." A.R.S. § 22-1501(3)(b). His violation of public policy claim argues that the County wrongfully "terminated" him. (*Id.* at ¶ 71). The parties dispute whether AEPA has superseded common law actions for wrongful termination. But assuming the claim still

---

[3] Furthermore, "constructive discharge may only be established" in one of two ways for the purposes of Arizona state law claims. A.R.S. § 23-1502(A). First, if the working conditions are "objectively difficult or unpleasant" and the employer has received advanced notice "that the employee intends to resign because of these conditions and the employer fails to respond to the employee's concerns." § 23-1502(A)(1). Second if there is evidence of "outrageous conduct by the employer" such as "sexual assault, threats of violence directed at the employee, a continuous pattern of discriminatory harassment" that "would cause a reasonable employee to feel compelled to resign." § 23-1502(A)(2). Pearlmutter concedes that his departure did not arise due to "difficult or unpleasant" conditions. (Doc. 105 at 13). And he makes no attempt at invoking the second way of establishing constructive discharge, nor has he presented the Court with evidence of the kind of "outrageous" conduct contemplated by the Arizona statute. To the extent that Pearlmutter argues that § 23-1502 does not apply to his particular claim of constructive discharge, such argument fails. By its plain language, the statute establishes the "only" way a plaintiff may establish constructive discharge in "any action under the statutes of this state or under common law . . . ." § 23-1502(A).

exists, it requires showing that an empoyer "fire[d]" an employee "for bad cause . . . ." *Wagenseller v. Scottsdale Mem'l Hosp.*, 147 Ariz. 370, 378, 710 P.2d 1025, 1033 (1985). Finally, his due process claim requires a showing that Defendants "deprived" Pearlmutter of a protected interest by terminating him. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972) ("The requirements of procedural due process apply only to the deprivation of interests . . . ."); *see also Knappenberger*, 566 F.3d at 941 (holding that voluntary departures do not serve as deprivations of protected interests in employment). As there is no genuine dispute that Pearlmutter voluntarily resigned, the Court must grant Defendants' Motion and enter judgment in their favor for all four claims.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 96) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Doc. 97) is **GRANTED**. The Clerk of Court shall enter judgment in Defendants' favor for all four of the Second Amended Complaint's Counts and terminate this action.

Dated this 16th day of June, 2022.

Honorable Diane J. Humetewa
United States District Judge